## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :

         v.      :      **CRIMINAL NO. 15-445-01**

JOHN R. HODDE      :

## UNITED STATES' GUILTY PLEA MEMORANDUM

### I.    INTRODUCTION.

Defendant John Hodde is charged in an information with two counts of wire fraud and conspiracy to commit wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1349. The charges arise from the defendant's participation in a scheme to defraud a business referred to as "Company A," which was the employer of co-conspirator Douglas Rae, by submitting bogus invoices to Company A. A guilty plea hearing is scheduled for Monday, November 23, 2015, at 3:00 p.m.

### II.    PLEA AGREEMENT.

Pursuant to the terms of the written guilty plea agreement, the defendant will plead guilty to both counts of the information. A copy of the plea agreement will be forwarded to the Court in advance of the guilty plea hearing.

### III.    ESSENTIAL ELEMENTS OF THE OFFENSES.

A.    The essential elements of a violation of the wire fraud statute (18 U.S.C. § 1343) are as follows:

     1.    The defendant knowingly devised, or willfully participated in, a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises;

     2.    The defendant acted with the intent to defraud; and

      3.      In advancing, furthering, or carrying out the scheme, the defendant transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce or caused the transmission of any writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate commerce.

B.      The essential elements of conspiracy to commit wire fraud (18 U.S.C. § 1349) are as follows:

      1.      Two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit mail fraud, as charged in the information; and

      2.      The defendant knew the unlawful purpose of the plan and willfully joined in it.

## IV.    MAXIMUM PENALTIES.

The maximum statutory penalty that can be imposed on each count of wire fraud and conspiracy to commit wire fraud is 20 years of imprisonment, three years of supervised release, a $250,000 fine, and a $100 special assessment.

Total Maximum Sentence is: 40 years of imprisonment, three years of supervised release, a $500,000 fine, and a $200 special assessment.  Full restitution shall be ordered.

## V.    FACTUAL BASIS FOR THE PLEA.

If this case were to proceed to trial, the government would introduce competent evidence which would establish that, at all relevant times, John Hodde lived in Virginia and was Manager of the Alexandria, Virginia office of Barbizon Capitol, Inc. ("Barbizon").  In connection with his job duties, Barbizon had issued to defendant Hodde a corporate American Express credit card to use for business purposes.  Barbizon was a lighting equipment supplier to numerous businesses, including the business referred to in the information as "Company A."

Douglas Rae was the Lighting Department Manager at Company A in West Chester, PA.  Rae was a supervisor and was responsible for purchasing, and overseeing the

2

purchasing of, lighting related products and services, including lamps and other items, as well as merchandise and services relating to larger projects such as studio set designs.  Rae had two outside business entities, Lighting Products International, Inc. ("LPI") and Lighting Equipment Sales and Service, Inc. ("LESS").  Rae controlled and operated LPI and LESS, and he controlled the companies' bank accounts.

Rae devised several schemes to steal from Company A, one of which involved having John Hodde submit false invoices from Barbizon to Company A.  This overall scheme was carried out in two ways.  First, Hodde allowed Rae to use Hodde's corporate credit card account from Barbizon to make hundreds of thousands of dollars of purchases, and then to reimburse Barbizon for its payment of the credit card bill, and thus its payment for Rae's charges, Hodde and Rae worked together to generate and submit bogus invoices from Barbizon to Company A, which Company A then paid.  Second, Rae convinced Hodde to have Barbizon act as the middleman in transactions between his outside companies, LESS and LPI, and Company A. Rae then submitted bogus invoices from LESS and LPI to Barbizon, and directed Hodde to generate and submit corresponding bogus invoices from Barbizon to Company A. Barbizon paid the LESS and LPI invoices, and then Company A paid the invoices from Barbizon.  Neither LESS, LPI, nor Barbizon supplied or shipped to Company A the products that were the subject of the invoices.  When Company A paid the invoices, Barbizon kept approximately 10%, and the remainder was passed on to LESS and LPI.

In connection with Rae's personal use of Hodde's corporate American Express account, Rae used the account to purchase numerous home appliances, airline tickets for him and his wife to visit their vacation home, personal electronics, dental services, and other items of a personal nature.  While Rae initially offered Hodde an excuse as to why he needed to use Hodde's credit card account for business purposes, Hodde soon realized that many of Rae's

purchases were personal in nature.  Hodde also realized that the invoices Rae directed him to submit to Company A to cover the American Express charges were bogus.  Hodde could see that the purchases Rae made on the credit card account did not match the items Rae asked Hodde to put on the invoices submitted to Company A.  Hodde nonetheless went along with the scheme and continued to allow Rae to use his credit card account, and to submit the bogus invoices to Company A as Rae directed.

On approximately a monthly basis, defendant Hodde reviewed his credit card charges for the month to determine which charges had been incurred by Rae.  Hodde typically e-mailed Rae a summary of the charges Rae had incurred for the month. For example, on December 7, 2010, Hodde sent Rae an e-mail detailing Rae's charges on Hodde's Barbizon American Express account for the prior month, an open credit between them, and how much Rae owed overall for the charges on the Barbizon American Express account [Count One].  Rae usually responded by e-mail as to whether he disagreed concerning his responsibility for any of the charges summarized by Hodde.  Rae then gave directions to Hodde concerning specific language to put on fictitious invoices from Barbizon to Company A so that Barbizon would be reimbursed by Company A for Rae's use of the Barbizon credit card account for his personal expenditures.  Rae's instructions typically included item descriptions, unit numbers, and prices for Hodde to put on the fraudulent invoices.

By agreement, the bogus invoices Rae instructed Hodde to generate included a built-in a profit margin for Barbizon to retain, which was usually 10% of what Rae had charged on Barbizon's American Express account.  Sometimes Rae and Hodde worked together to generate bogus invoices from Barbizon to Company A that were in dollar amounts equal to what Rae had charged on Hodde's Barbizon corporate credit card account for the period, plus the approximately 10% mark-up.  Other times, the bogus invoices from Barbizon to Company A did

4

not match the amount that Rae had charged for the month, and then usually Rae and Hodde carried the balance forward and made up for it in future bogus invoices to Company A.  For example, on December 20, 2010, Hodde sent Rae an e-mail with the attached bogus invoice for Company A to cover Rae's November 2010 American Express charges, and netting out an open credit between them from that total [Count Two].  Each of the e-mails specified above travelled in interstate commerce.

Defendant Hodde caused the bogus invoices from Barbizon, which he had created at the direction of Rae, to be submitted to Company A.  Company A paid Barbizon for the amounts invoiced, resulting in Company A paying over $560,000 for the fraudulent invoices.

In connection with the transactions indirectly billed from LESS or LPI, to Barbizon, and then to Company A, Rae caused LESS and LPI to invoice Barbizon for certain products.  LESS and LPI did not supply or ship any of the pertinent product to Barbizon or Company A.

At Rae's direction, defendant Hodde caused Barbizon to pay the bogus LESS and LPI invoices.  Rae kept the proceeds for his personal use.  Rae and Hodde caused Barbizon to submit corresponding bogus invoices to Company A for product purportedly sold by Barbizon to Company A.  Rae and Hodde created the Barbizon invoices to Company A in amounts equal to the LESS and LPI invoices to Barbizon, plus an additional approximately 10% mark-up, which they agreed Barbizon was to keep.  Barbizon did not supply or ship any of the pertinent product to Company A.  Hodde caused the bogus invoices from Barbizon, which he had created at Rae's direction, to be submitted to Company A.  Company A paid Barbizon for the amounts of those invoices.

This second part of the scheme (the "indirect billing") occurred at the same time as the American Express part of the scheme.  Hodde knew that Barbizon was not supplying any

of the product that was the subject of the "indirect billing" invoices to Company A.  While Rae may not have informed Hodde that LESS and LPI were not shipping any of the product to Company A, either, there were instances when it was evident that the Barbizon invoices Hodde generated and submitted to Company A for payment did not match the products that were described on the invoices Hodde received from LESS and LPI, giving him sufficient notice that the transactions were not legitimate.  There was also cross-over between the American Express part of the scheme and the "indirect billing" part of the scheme.  In at least one instance, Hodde and Rae made up for a shortfall to Barbizon in one of the "indirect billing" set of invoices by adding the amount of the shortfall to one of the Barbizon invoices to Company A that reimbursed Barbizon for Rae's American Express charges.  Although Hodde had sufficient information to, at a minimum, suspect that the "indirect billing" invoices were not valid, Hodde did not confront or even ask questions of Rae and went through with the transactions as directed by Rae.

In this manner, Rae and Hodde caused Company A to pay more than half a million dollars for goods and services that LESS, LPI, and Barbizon had not supplied or provided to Company A.

This memorandum sets forth only the essential facts that would need to be proved to establish the elements of the offenses charged.

ZANE DAVID MEMEGER
United States Attorney


*s/ Nancy E. Potts*
NANCY E. POTTS
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing was filed electronically, is available for

viewing and downloading from the Electronic Case Filing system, and was served by electronic

filing upon:

> Iris Bennett, Esq.
> Smith Pachter McWhorter PLC
> 8000 Towers Crescent Drive, Suite 900
> Tysons Corner, VA 22182
> ibennett@smithpachter.com
>
> Nicholas C. Harbist, Esq.
> Blank Rome LLP
> 301 Carnegie Center
> Princeton, NJ 08540
> Harbist@BlankRome.com

Date: November 24, 2015                    *s/ Nancy E. Potts*
                                           Nancy E. Potts